WATSON, Judge.
Plaintiff, Clinton B. Griffith, filed this lawsuit against defendants: Elmer E. Hasha (hereafter “Elmer”), plaintiff’s former brother-in-law, now deceased; Malvern M. Hasha (hereafter “Malvern”), plaintiff’s brother-in-law; and Jack M. Hayden (hereafter “Hayden”) a Texas patent attorney, asserting a 53% stock ownership in a Texas oil field service corporation known as Gator Hawk External Testers, Inc. (hereafter “Gator”). In the alternative, plaintiff asked recovery of compensation for services rendered the corporation; expenditures made on behalf of the corporation; and money advanced to the corporation; as well as damages for alleged breach of a stock ownership agreement. During the proceedings, the estate of Elmer was substituted as a party defendant; Griffith Rental Tools, Inc. (hereafter “G.R.T.”) was made an additional party plaintiff; and Gator was added as an additional party defendant.
We will not detail the history of the lawsuit as reflected in the extensive record. The matter was eventually tried on *779 the merits over a period of two weeks, and the trial court rendered judgment denying plaintiffs any stock ownership in Gator and also denying plaintiffs’ claim for an accounting and damages. Plaintiffs, Griffith and G.R.T., were awarded judgment against defendants for $10,600. A recon-ventional demand by defendants was denied.
Plaintiffs have appealed from the judgment of the trial court, contending that the trial court erred in finding that Griffith was not entitled to stock in Gator.
The trial court, in written reasons for judgment, made factual findings which in summary are as follows:
In June, 1969, Modern Drilling Tools and Supply Company, Inc. (hereafter “Modern”), which later became Gator, was in financial difficulty in connection with a loan from the First City National Bank of Houston (hereafter “F.C.N.B.”), which was personally guaranteed by Malvern, Thomas F. Soriero, Charles Richards, Guy Matthews and Hayden. Malvern retained John Feather, a Dallas attorney, who specialized in problems of financially troubled companies, in connection with this problem, and Feather said the corporation needed $150,000 to continue in business. Malvern telephoned Griffith, who was engaged in the rental tool business in Lafayette, Louisiana and who was a person of considerable experience in oil field service, and requested a meeting to discuss the situation. A meeting was held among Feather, Mal-vern, Elmer and Griffith on June 13, 1969.
As a result of this meeting, a letter was written by Malvern to Griffith on June 14, 1969, and Griffith signed a copy to signify his apparent accord. This letter states the arrangement between the parties to be as follows:
“1. Prior to your undertaking the commitments described in this letter, the Company shall have, at least, $38,000 in cash, for its working capital needs.
‘2. I shall immediately resign as President of the Company and you will be elected President and Chief Executive Officer. Both of our signatures shall be required on all Company bank accounts. You will not receive any compensation for your services as President and Chief Executive Officer, and I shall undertake a maximum sales and production effort in the testing business.
‘3. The Company shall no longer engage in the supply business.
‘4. The current fixed operating overhead of the Company shall be reduced so as to be no greater than $12,000 per month, including the fixed salaries of all personnel.
‘5. The Company shall undertake to arrange its bank financing so as to be able to pay the $150,000 in equipment 'indebtedness in accordance with the terms of the original $150,000 note evidencing this indebtedness. All existing accounts receivable shall be committed in full to the payment of the existing accounts receivable indebtedness and no further such indebtedness shall be incurred by the Company.
[6. The existing trade accounts payable of the Company shall be reduced in number to approximately 27 by the payment of approximately $30,000 by August 15, 1969. This payment will leave a balance of approximately $120,000 owed to the remaining 27 trade accounts payable. Each of these remaining trade accounts shall be offered an interest bearing promissory note of the Company payable, principal and interest, in 24 equal monthly payments, It should be understood that other arrangements may be required with these *780 remaining' 27 accounts payable, but in no event shall payment be com-mited at a rate which would pay such accounts than 12 month from August 15, 1969.
“7. You shall, and do hereby, commit and obligate yourself to purchase shares of common stock of the Company, to be issued by the company, up to $150,000 in value. The Company shall be entitled to call upon you to purchase such shares at any time after August 1, 1969 so that at no time shall the Company be unable to meet the scheduled repayment of its existing indebtness, as outlined in Paragraphs 5 and 6 above, after meeting its working capital needs out of the operations of the Company.
“8. Such part or all of the $150,000 in equity financing described above, as you are required to furnish, shall entitle you to be issued by the Company such number of shares of its common stock shall equal 51% of its then outstanding shares, if all of such $150,000 is required.
“9. It is understood that your comiitment [sic] outlined above is subject to the Company’s bank and trade accounts payable accepting the arrangements outlined in Paragraphs 5 and 6 above, and is further subject to the terms of the attached letter.” (Exhibit D-2)
On July 9, 1969, Griffith signed a $100,000 guarantee for Modern/Gator’s note at F.C.N.B. in consideration for which F.C.N.B. renewed the note.
Griffith never received any stock in Gator. He did become chief executive officer of the corporation but was removed from the board of directors at a shareholders’ meeting on January 15, 1971, and replaced as president at a board meeting the same day. This lawsuit resulted. Griffith admitted at trial that he never paid $150,000 for stock ownership in the corporation. Griffith claimed payment by transfer of assets to Gator, but the evidence was insufficient on this point. The trial court found that Griffith had not incurred the expenses claimed on behalf of the corporation and denied reimbursement therefor. Griffith’s accounting of his expenses was admittedly fabricated for trial purposes, and the trial court said that this cast doubt on his testimony as a whole. There was a claim for salaries paid by G. R.T. on behalf of Gator, but the trial court found that the employees of G.R.T. did no work for Gator with some minimal exceptions. Griffith’s claims for salaries due him were denied for lack of proof of a contract, the trial court noting that quantum meruit was not pleaded.
The trial court found that Griffith paid $10,600 to Gator and gave judgment to plaintiffs for that amount but stated that the evidence did not establish a right to any stock in the corporation as a result of this payment. This concludes our synopsis of the trial court's more detailed findings.
. The issue in this matter is whether plaintiff Griffith is entitled to stock ownership in Gator. Although we are concerned with the legal issue of the right to stock ownership, the issue turns on questions of fact and credibility. These questions of fact and credibility were decided by the trial court adversely to plaintiffs, and our task on appeal is to determine whether or not there is manifest error in the trial court’s conclusions.
Our review of the record convinces us that the trial court’s conclusions are correct under the evidence. The record shows that Griffith did not in fact purchase any stock in Modern/Gator. The agreement between Griffith and F.C.N.B. provided that:
“Purchaser’s $100,000 liability . shall be reduced from time to time to the extent of the dollar amount of the *781 . common stock actually purchased and paid for in cash by Purchaser .... Such reduction in liability shall not be effective unless and until Bank has been notified in writing by Purchaser of any such purchase and Modern has acknowledged to Bank in writing that it has received in cash the purchase price therefor.” (TR. 356)
William G. Post, Jr., vice-president of F.C.N.B., testified in deposition that he was familiar with Modern/Gator’s account with that bank. The corporation’s note with the bank was last renewed on October 15, 1971, and then had a balance of $67,500. At the time of Post’s deposition on February 22, 1972, the balance on the note was $57,500. Included in the security on the note was a guarantee agreement of July 9, 1969, the agreement executed by Griffith. Had plaintiff Griffith in fact purchased stock, he would have had his exposure on that note guarantee reduced. No testimony was elicited from Post that this was ever done.
James V. Riner, vice-president of Pelto Oil Company, former vice-president and lending officer of F.C.N.B., testified by deposition that he had worked in the petroleum and minerals department of F.C.N.B. He notified Malvern on May 31, 1969, that, if steps were not taken by Modern to pay its notes at the bank, the notes would be accelerated. According to his information at the time, Modern owed $150,000 on an equipment note plus accrued interest; $21,000 for one accounts receivable note; $24,000 for another; and $12,800 for a third. Riner was working with Ralph Harper, attorney for the bank; the senior officers of the bank; Malvern; and attorney Feather in trying to arrange a workout for the loans. Riner identified the agreement between Griffith and F.C.N.B. dated July 9, 1969, and testified that it was prepared by attorney Harper of the Houston law firm of Vincent Elkins. As of June 12, 1969, Riner had accelerated maturity of Modern’s notes but, after negotiations between the parties and the execution of the agreement between Griffith and F. C.N.B., the notes were reinstated according to their original terms. Riner testified that this agreement provided that Griffith’s guarantee to the bank would be reduced by the amount that Griffith put up for purchase of stock. As of the time that Riner left F.C.N.B. on September 15, 1969, the bank had not been notified of any such stock transaction. Had the bank received notification of a stock purchase by Griffith, the guarantee would have been reduced by that amount, although Riner would probably have insisted that the money be paid on the bank note. Riner also conferred with Griffith in his office at F. C.N.B., received a financial statement from him, and discussed his financial responsibility with his bank in Lake Charles. Although Griffith signed the guarantee on the $150,000 equipment note, he did not sign the accounts receivable notes.
Plaintiff Griffith testified that he transferred assets from G.R.T. to Gator. He put $10,600 in cash into Gator to pay for a 53% stock interest; the other funds were to be a loan; additional consideration for-the stock interest was said to be Griffith’s $100,000 guarantee at F.C.N.B. Griffith also said that he had put considerable time and effort into the company. Griffith did not know whether his stock ownership percentage was supposed to be 51% or 53% but said the agreement was that he would have a majority of the stock.
Elmer testified in deposition that the agreement of June 14, 1969, required Griffith to put up $150,000 in order to purchase 51% of the corporation, and Griffith did not put up the money.
Malvern testified that Modern/Gator was $400,000 in debt when Griffith was first contacted to help. According to him, the letter agreement provided that Griffith’s acquisition of 51% of Gator’s stock was contingent on Griffith furnishing $150,000 to the corporation which he failed to do. He said that the original note at *782 F.C.N.B. was still in existence and still guaranteed by Griffith up to the amount of $100,000. Malvern stated that .the bank had never been notified of any purchase of stock by Griffith as required in Griffith’s guarantee.
Attorney John Feather testified that two proposals were made to Griffith at the June 13, 1969, meeting. The first provided that Griffith would put up $150,000 and receive 51% of the outstanding stock, but Griffith rejected this proposal. The second proposal was a stock subscription agreement and is embodied in the letter agreement of June 14, 1969. The commitment made by Griffith in the letter agreement provided that funds would not be made available until after August 1, and Griffith insisted on this date to allow him time to sell G.R.T. Feather testified that the agreement with the bank protected Griffith from putting money in the company to.buy stock and also being called upon by the bank. Thus, each dollar Griffith used to buy stock reduced the amount of his guarantee with F.C.N.B. Feather testified that Griffith’s liability on the note was limited to some extent by the fact that the obligations at the bank were also secured by the physical assets, accounts receivable and contract rights of the company, as well as five other individual guarantors.
The corporation record book of Modern was introduced into evidence. It contains a waiver of notice of a stockholders’ meeting of June 21, 1969, by Malvern and Hayden, which states that they are the sole stockholders. At this meeting Griffith was elected a director of the corporation. At a directors’ meeting on the same date, Griffith was elected president of the corporation. A subsequent waiver of notice of a stockholders’ meeting of September 23, 1969, was also signed by Malvern and Hayden as the sole stockholders. At this meeting of September 23, the secretary of the corporation was authorized to change the name from Modern to Gator. The minutes of a board of directors’ meeting of Gator on January 9, 1971, reflect that Griffith was elected chairman of the board. At this meeting, Hayden stated:
“. . ., at the present time the only stockholders are Malvern and myself.”
This statement was not contradicted by Griffith or anyone else present and the minutes are certified as complete and correct by an official shorthand reporter of the State of Texas, who transcribed the entire meeting. If Griffith in fact believed he owned stock in the corporation at this time, it is difficult to understand why he did not disagree with the statement that Malvern and Hayden were the only stockholders. A special meeting of the stockholders was called for January 15, 1971, and plaintiff Griffith was removed from the board of directors at this meeting.
Pat C. McBride, a CPA and secretary-treasurer of the Kilroy Company of Texas, testified that he made a survey of Gator in November of 1970 when his company was interested in acquiring stock ownership in Gator. A verbal offer was made to Hayden and Malvern, but the deal was never concluded; Hayden returned Kilroy the $15,000 earnest money which had been given to him. McBride testified that Gator had what he considered excessive expenses for travel and entertainment and that he was genuinely concerned about the management of the company. At the time of his report on November 30, 1970, McBride felt “. . . the company needs about a $125,000 cash transfusion . . . ”.
Thus, near the conclusion of Griffith’s service as chief executive officer of Gator, the company still had the liquidity problems it had when he first came in contact with the company.
The record is devoid of any evidence that plaintiff Griffith actually acquired stock in Modern/Gator. Plaintiffs *783 contend that Griffith received stock certificates for 2650 shares, but the copies of the three certificates introduced in evidence, each for 2650 shares, all lack signatures of the corporate officers and a corporate seal. Copies of other corporate share certificates in the record have both signatures and a seal. Eddie M. LeBlanc, at CPA, testified that he made out the certificates and then turned the stock book and minute book over to attorney William Gearheard who was handling the legal affairs of the corporation and was to have had the certificates signed by the corporate officers and issue the stock. Plaintiff Griffith’s stock was never legally issued. The parties envisioned that Griffith would acquire stock in the corporation but plaintiff Griffith never put up the money necessary for the purchase. We are convinced, as was the trial court, that plaintiff Griffith did not comply with the agreement contained in the letter of June 14, 1969, and thus is not entitled to stock in the corporation. Plaintiffs contend that this letter was merely a preliminary agreement and was later modified, but there is nothing in the subsequent actions of the parties that proves a contrary intention. Although plaintiff Griffith apparently performed valuable services for the corporation, he also collected substantial sums for his expenses. Gator’s 1970 federal corporate tax return shows compensation to Clinton B. Griffith of $17,250.00. However, the checks in the record as P-74 indicate that he received the sum of $24,563.20 in 1970.
Plaintiffs make an alternative contention that they should now be entitled to buy stock in Gator under the terms set forth in the agreement of June 14, 1969. However, an examination of that agreement shows that exercise of the stock subscription rights was contingent on various other requirements. The agreement as a whole has not been fulfilled. Plaintiffs have not proven compliance with its terms and cannot demand performance by defendants.
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed to plaintiffs-appellants.
Affirmed.